Michael C. Geraghty, ABA No. 7811097
William R. Crowther, ABA No. 2211097
HOLLAND & HART LLP
420 L Street, Suite 550
Anchorage, Alaska 99501
Telephone:    (907) 865-2600
Facsimile:    (907) 865-2680
mcgeraghty@hollandhart.com
wrcrowther@hollandhart.com

*Attorneys for CipherBlade, LLC, a*
*Pennsylvania Limited Liability Corporation*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| CIPHERBLADE, LLC, a Pennsylvania Limited Liability Corporation,<br><br>    Plaintiff,<br><br>  v.<br><br>CIPHERBLADE, LLC, an Alaska Limited Liability Corporation, MANUEL KRIZ, MICHAEL KRAUSE, JORN HENRIK BERNHARD JANSSEN, JUSTIN MAILE, IOANA VIDRASAN, CIPHERBLADE APAC PTE LTD, a Singapore Limited Company, JUSSI AITTOLA, OMEGA3ZONE GLOBAL LTD., a Cyprus Limited Company, PAUL MARNITZ, INQUISITA SOLUTIONS LTD., a Cyprus Limited Company, and GREEN STONE BUSINESS ADVISORY FZ LLC, a United Arab Emirates Limited Liability Corporation.,<br><br>    Defendants. | Case No. 3:23-cv-_____ |

# COMPLAINT

1.     Plaintiff CipherBlade LLC ("CipherBlade PA"), by and through its attorneys, Crowell & Moring LLP and Holland & Hart LLP, allege as follows in this Complaint against Defendants CipherBlade LLC, an Alaska Limited Liability Corporation; Manuel Kriz; Michael Krause; Jorn Henrik Bernhard Janssen; Justin Maile; Ioana Vidrasan; CipherBlade APAC PTE LTD, a Singapore limited company; Jussi Aittola; Omega3Zone Global LTD, a Cyprus limited company; Paul Marnitz; Inquisita Solutions Ltd. a Cyprus limited company; and Green Stone Business Advisory FZ LLC, a United Arab Emirates LLC.

## NATURE OF THE ACTION

2.     This is a civil action for (i) misappropriation of trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836, (ii) violation of the Computer Fraud and Abuse Act (18 U.S.C. § 1030 *et seq.*), (iii) unfair competition (15 U.S.C. § 1125(a)), (iv) related state claim claims for tortious interference with contracts, tortious interference with business advantage, conversion, trespass to chattels, fraud, and unjust enrichment, and (v) violation of the Racketeer Influenced and Corrupt Organizations Act (18 USC § 1961, *et seq.*).

3.     Plaintiff originally filed a Complaint, on June 30th, 2023, and an Amended Complaint, on July 18th, 2023, in the Southern District of New York moving for preliminary injunction and other relief. The motion for preliminary injunction resulted in a

COMPLAINT
Cipherblade LLC v. Cipherblade, LLC et al., Case No. 3:23-cv-_____
Page 2 of 62

stipulated order granting relief in part. Subject to the corresponding stipulation, the motion for preliminary injunction was denied. Defendants raised jurisdictional issues over the Alaska Entity and other Defendants. Therefore, Plaintiff voluntarily withdrew the Complaint and brings the action in this Court, against the domiciled Defendants, as well as the other named Defendants, who have acted by and through the Alaska domiciled Defendants.

4.      Plaintiff seeks equitable relief and damages against Defendants who wrongfully control and operate Plaintiff CipherBlade PA's IT infrastructure and converted corporate assets, including customer and business trade secrets and confidential information, and who pass off CipherBlade PA's services for their own. Defendants, through their illegal activities involving misuse of CipherBlade PA assets, infrastructure, and resources, have caused and continue to cause irreparable injury to Plaintiff, their customers, and the public.

## **PARTIES**

5.      Plaintiff CipherBlade LLC (hereinafter, "CipherBlade PA" or "Plaintiff") is incorporated in Pennsylvania, and is wholly owned by Richard Sanders, who has always been the sole director of CipherBlade PA.

6.      Defendant CipherBlade LLC (hereinafter the "Alaska Entity") is, upon information and belief, an Alaska limited liability corporation with offices at 310 K Street, Suite 200, Anchorage, AK 99501, and is owned and/or controlled by Mr. Justin Maile.

COMPLAINT
Cipherblade LLC v. Cipherblade, LLC et al., Case No. 3:23-cv-_____
Page 3 of 62

7.     Defendant Justin Maile is a natural person domiciled, on information and belief, in Alaska at 655 W 22nd Ave, Anchorage, AK 99503.

8.     Defendant CipherBlade APAC PTE LTD (hereinafter, "the Singapore Entity") is, on information and belief, a Singapore limited company with offices at 30 Cecil Street, #19-08 Prudential Tower, Singapore 049712 and which is owned and/or controlled by Mr. Jussi Aittola.

9.     Defendant Jussi Aittola is a natural person domiciled, on information and belief, in 183 Upper Thomson Road apt 03-02, 574332, Singapore.

10.     Defendant Omega3Zone Global LTD is, on information and belief, a Cyprus limited company with offices at 9 Stelmio Building, Flat/Office 301, 8020, Paphos, Cyprus. Upon information and belief, Mr. Paul Marnitz is a director.

11.     Defendant Paul Marnitz is a natural person domiciled, on information and belief, in Cyprus at Georgiou Pitrou, Mesogi, Paphos, 8280, Cyprus.

12.     Defendant Manuel Kriz (also known as "Matthew Greene") is a natural person domiciled, on information and belief, in Cyprus at 9, Stelmio Building, Floor 3, Flat/Office 301, 8020, Paphos, Cyprus.

13.     Defendant Ioana Vidrasan is a natural person domiciled, on information and belief, in Cyprus at 9 Stelmio Building, Floor 3, Flat/Office 301, 8020, Paphos, Cyprus, Greece.

14. Defendant Michael Krause is a natural person domiciled, on information and belief, in Georgiou Pitrou, Mesogi, Paphos, 8280, Cyprus.

15. Defendant Jorn Henrik Bernhard Janssen (also known as "Jan") is a natural person domiciled, on information and belief, in Cyprus at Georgiou Pitrou, Mesogi, Paphos, 8280, Cyprus.

16. Defendant Inquisita Solutions Ltd. is, on information and belief, a Cyprus limited company with offices at 9 Stelmio Building, Floor 1, Flat/Office 102, 8020, Paphos, Cyprus.

17. Defendant Green Stone Business Advisory FZ LLC is, on information and belief, a United Arab Emirates limited liability company with offices at A4-712, Building no. A4, Al Hamra Industrial Zone-FZ, Ras Al Khaimah, United Arab Emirates.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this case pursuant to the Defend Trade Secrets Act (18 U.S.C. § 1836), the Computer Fraud and Abuse Act (18 U.S.C. § 1030 *et seq.*), unfair competition under the Lanham Act (15 U.S.C. § 1125(a)), and the Racketeer Influenced and Corrupt Organizations Act (18 USC § 1961, *et seq.*).

19. This Court also has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332, because, upon information and belief, all the Defendants are citizens of jurisdictions other than the states where Plaintiff is a citizen and the amount in controversy exceeds $75,000.

20. The Court also has jurisdiction over this case pursuant to Alaska Code of Civil Procedure § 09.05.015 (a)(3) because the theft of monies and other assets and fraudulent activity set forth herein was perpetuated by the Defendants by and through the Alaska Entity. Furthermore, the fraudulent solicitation of clients by Defendants and for their benefit occurred by and through the Alaska Entity.

21. The venue in this action is proper within this District pursuant to 28 U.S.C. § 1391(b) because the Alaska Entity and Justin Maile are located and doing business in this District and the misappropriation and fraudulent conduct alleged herein were conducted by Defendants through the Alaska Entity.

22. The Alaska Entity now controls a majority of CipherBlade PA's infrastructure as a result of the illegal actions of Defendants, including fraudulent contract assignments, the theft of CipherBlade PA's technical and business infrastructure, and the theft of the CipherBlade PA website and domain name.

23. Defendants fraudulently assigned the contracts of CipherBlade PA staff to the Alaska Entity. Defendants accomplished this by misleadingly using an email address richard@cipherblade.com, to which Mr. Sanders did not have access. This allowed Defendants to impersonate him and sign contracts in his name using forged signatures. Defendants did not have authorization to perform these actions or sign such contracts.

24. In fact, the richard@cipherblade.com email address was used to register a 'myAlaska' account with the state of Alaska on March 15, 2023.

25.     Defendants are subject to personal jurisdiction in the State of Alaska because Defendant Justin Maile and the Alaska Entity are residents of Alaska and Defendants acted in concert to misappropriate and/or receive the assets and business of Plaintiff. Defendants acted in concert to fraudulently transfer Plaintiff's assets to the Alaska Entity, which enterprise Defendants have used to benefit themselves to the detriment of Plaintiff. Defendants have used the Alaska Entity as a vessel through which they have misappropriated trade secrets, customers, future customer leads, confidential and privileged information, and CipherBlade PA financial assets.

26.     Defendants are subject to personal jurisdiction in the State Alaska and venue in this Court because, through tortious conduct in this District, acting through the Alaska Entity, they caused injury to CipherBlade PA's important business partnerships and customer relations.

## FACTUAL BACKGROUND
### Introduction

27.     On February 19, 2019, Mr. Sanders founded CipherBlade PA in the United States as Plaintiff, which entity he wholly owns.

28.     The Plaintiff, CipherBlade PA, is a blockchain investigation company that investigates cryptocurrency-related matters, often involving cybercrime. CipherBlade PA also tracks Bitcoin and other cryptocurrency assets. Over the last five years, CipherBlade PA has investigated, tracked and provided consulting services on cases leading to the

recovery of over $50 million, and the location of cryptocurrencies or other assets obtained through cryptocurrency transactions valued in the billions of dollars.

29.    CipherBlade PA also assists federal government agencies, private companies, and individuals in investigations of financial crimes. And over the course of its work and promotional activity, CipherBlade PA has developed a reputation in the industry and with the U.S. government and private entities alike as a trusted partner in these types of investigations and has garnered goodwill throughout the industry.

30.    In late 2022, Mr. Sanders sought to take a step back from the day-to-day operations of CipherBlade PA to volunteer in Ukraine assisting the Ukrainian National Police with investigations involving cryptocurrency. Mr. Sanders departed from his residence in Pittsburgh Pennsylvania to Ukraine on February 15, 2023.

31.    As explained herein, after Mr. Sanders left for Ukraine, Defendants engaged in the theft of CipherBlade PA trade secrets, theft of property and assets, fraudulent misrepresentations regarding key aspects of the business to Mr. Sanders and third parties and engaged in a criminal racketeering scheme to steal CipherBlade PA, its clients, and its assets away from Mr. Sanders and CipherBlade PA, and redirected clients, infrastructure, and assets to the Alaska Entity and the Singapore Entity for the benefit of all Defendants.

32.    Specifically, knowing Mr. Sanders would be in Ukraine, prior to and just after his departure, Defendants made material misrepresentations to Mr. Sanders to gain access to his accounts, stole trade secrets in the form of confidential investigation

information, customer leads, customer lists, and investigatory data and stole access to the CipherBlade PA business itself.

33.     The Defendants engaged in mail and wire fraud in the furtherance of their scheme by using Mr. Sanders' information to take over the CipherBlade.com Domain, and CipherBlade PA IT infrastructure. With access to CipherBlade PA's internal systems, Defendants continue to make material misrepresentations that have resulted in interference with contracts and business relationships, loss of client engagement, and Defendants have even siphoned off significant funds via fraudulent entities and shell companies.

### CipherBlade PA Personnel

34.     Around March 1, 2021, Defendant Kriz began working for CipherBlade, PA. Defendant Kriz never had any ownership of CipherBlade PA, was never a director of CipherBlade PA, and he did not have the authority to sign documents on Mr. Sanders' behalf, or make any critical decisions for CipherBlade PA. He also did not have authority to transfer corporate assets or infrastructure from CipherBlade PA. None of the other Defendants had any authorization or authority to do so either.

35.     In mid-2021, Defendant Kriz told Mr. Sanders that he would like to hire an additional individual, allegedly named Mr. Michael Kramer, but who in fact is the Defendant whose real name is Mr. Michael Krause, in a limited capacity, to assist with CipherBlade PA's daily tasks. Mr. Sanders agreed. Mr. Kriz indicated to Mr. Sanders that Michael was a "good friend of his." Mr. Kriz introduced Michael to CipherBlade PA staff

at large in the below message on a CipherBlade internal Slack channel. *See* **Figure 1.**



**Figure 1**

36.     However, shortly thereafter, in late 2021/early 2022, Mr. Kriz advised Mr.

Sanders that he required more assistance with his daily tasks, and he would be elevating

Mr. Krause to a more substantial role. Mr. Sanders agreed.

37.     Over time, Mr. Sanders, at the request of Mr. Kriz, gave Mr. Krause limited authority, upon request, to take on additional backend office duties, such as handling routine transactions and routine administrative functions, for which Mr. Sanders would be given prior notice (e.g., compensating staff, negotiating with and paying CipherBlade PA vendors, etc.). Mr. Krause, over time, obtained Mr. Sanders' trust and used that trust and apparent friendship to further Defendants misappropriation and misconduct.

38.     Mr. Krause never owned any portion of CipherBlade PA and has no equity interest in the company.

39.     In January 2023, as Mr. Sanders prepared for his trip to Ukraine, he recognized that he required assistance managing the administrative, business management, and accounting tasks at CipherBlade PA. Mr. Sanders entrusted Mr. Kriz and Mr. Krause with these tasks for several months leading up to and while Mr. Sanders was in Ukraine.

40.     Both Mr. Kriz and Mr. Krause were subsequently granted limited administrative access and authority to manage CipherBlade PA's IT infrastructure and were also authorized to retain others as needed.

41.     In late 2022 and early 2023, Mr. Kriz hired Mr. Krause's son, Jorn Henrik Bernhard Janssen. Mr. Kriz also hired Ioana Vidrasan.

42.     Mr. Kriz advised Mr. Sanders that these two individuals were hired in an assistant-like capacity.

COMPLAINT
Cipherblade LLC v. Cipherblade, LLC et al., Case No. 3:23-cv- _____
Page 11 of 62

43.     Mr. Kriz and Mr. Krause also subsequently hired Justin Maile in March 2023 and Jussi Aittola in April 2023 to work as investigators.

44.     While Mr. Sanders consented to Mr. Maile's hiring, Mr. Sanders did not consent to the terms of the initial contract that Mr. Maile had with CipherBlade PA. The Defendants forged Mr. Sanders' signature on this contract, and he was not aware of its content.

### Defendants Made Material Misrepresentations to Mr. Sanders as Part of a Scheme to Steal CipherBlade PA, Its Assets, and Trade Secret Information

45.     On January 30, 2023, Defendants utilized the richard@cipherblade.com email address, without Mr. Sanders' consent to sign an 'Amended and Restated Limited Liability Company Agreement' for CipherBlade PA, and proceeded to forge Mr. Sanders' signature on this fabricated agreement drafted by the Defendants. Mr. Sanders never authorized a revised operating agreement for CipherBlade PA.

46.     None of the Defendants are signatories of this purported agreement. However, Mr. Krause and Mr. Kriz were both recipients of this purported agreement.

47.     The Defendants represented to Mr. Sanders that setting up separate entities may be necessary to facilitate business opportunities and segregate business lines in the future. Defendants then falsely represented to Mr. Sanders that the separate CipherBlade entities would be set up in Alaska and Singapore and each would be: (i) affiliated with CipherBlade PA, and (ii) registered as owned by Mr. Sanders.

48.     The Defendants spent significant time explaining to and attempting to convince Mr. Sanders that this was a necessary part of CipherBlade's logical growth and expansion.

49.     Finally, Mr. Sanders relented and allowed Mr. Maile and Mr. Aittola to be added to the team.

50.     Almost immediately after being hired by CipherBlade PA, Mr. Maile went out on his own and created his own company, mimicking the name "CipherBlade LLC," and incorporated it in Alaska (the Alaska Entity) and proceeded to work with other Defendants to steal CipherBlade PA assets and infrastructure via misrepresentation and fraudulent assignment contracts.

51.     Mr. Maile purportedly resigned from CipherBlade PA on April 14, 2023, by sending an email with his resignation to richard@cipherblade.com. However, this is not Mr. Sanders' email address and neither Mr. Sanders nor CipherBlade PA were aware of Mr. Maile's resignation or the existence of the email.

52.     Similarly, Mr. Aittola also created his own limited company in Singapore, CipherBlade APAC Pte Ltd ("the Singapore Entity").

53.     Neither of these new entities were controlled (or are controlled) by Mr. Sanders, despite Defendants' representations to the contrary.

54.     In truth, neither the Alaska Entity or the Singapore Entity were associated with CipherBlade PA or Mr. Sanders.

55.     Defendants created a fraudulent "Infrastructure Agreement" between CipherBlade PA and the Alaska Entity on April 12, 2023. Mr. Sanders did not sign this document and was not aware of this document. Defendants fraudulently used the [richard@cipherblade.com](mailto:richard@cipherblade.com) email address to give the appearance that Mr. Sanders was aware of this. Mr. Sanders did not have access to the [richard@cipherblade.com](mailto:richard@cipherblade.com) email.

56.     This "Infrastructure Agreement" allowed for the sharing of a) software and software infrastructure that CipherBlade PA owned and used as part of its business, b) sharing of personnel and c) data sharing and sharing of confidential information.

57.     The fraudulent agreement was extremely one-sided and partial to the Alaska Entity such that CipherBlade PA effectively could not terminate the agreement, but the Alaska Entity could do so at will. Specifically, Section 3(d) of that agreement states: "CipherBlade AK may terminate this agreement with respect to each individual component of the Infrastructure of[sic] all components with a notice period of 30 days" while Section 3[e] states: "CipherBlade PA may not terminate this agreement except in the event that CipherBlade AK violates its obligations under this Agreement, in which case CipherBlade PA may terminate this agreement with respect to those components for which such obligations were violated with immediate effect." This fraudulent Infrastructure Agreement was never disclosed to Mr. Sanders or CipherBlade PA and was not agreed to by them.

58.     These acts involved fraudulent misrepresentations and conduct by which Defendants conspired to convert CipherBlade PA assets – including its corporate trade secrets and confidential information, employees and contractors, business contracts, customer contracts and financial assets – and to transfer these assets to the Alaska Entity and thus their control, as well as the control by entities operated by Defendants, all without Mr. Sanders' authorization.

**Defendants, Through Misrepresentations, Gained Access to Mr. Sanders Email and Personal Information, Which They Used to Impersonate Mr. Sanders and Engage in Mail and Wire Fraud**

59.     Immediately before Mr. Sanders went to Ukraine, Mr. Kriz and Mr. Krause convinced him to grant them access to the email address richard@cipherblade.com, to facilitate electronic signing of routine client engagements while Mr. Sanders was gone. While Mr. Sanders was aware of the richard@cipherblade.com email address to facilitate these routine matters, he did not have access to it. Therefore, he was unable to send and receive emails from this address or see the contents of its inbox.

60.     Mr. Sanders trusted that if his colleagues ever needed to use this email address for more than the limited purpose described above, they would make him aware of the reasons why and request authorization. Unfortunately, this was not the case.

61.     As shown below, Defendants repeatedly used Mr. Sanders' email and credentials in a fraudulent manner which exceeded their authorization. Defendants used this email account to fraudulently communicate with others, purportedly on behalf of

CipherBlade PA and Mr. Sanders himself.

62. On multiple occasions, Defendants tried gaining access to Mr. Sanders' personal "rich@cipherblade.com" email but were unsuccessful. For example, on January 31, 2023, Defendants solicited Mr. Sanders for access to his personal "rich@cipherblade.com" email, which Mr. Sanders did not provide. Defendants repeatedly made these types of access requests, messaging Mr. Sanders to ask for direct access to his email, but Mr. Sanders always refused these requests.

63. In early April 2023, Mr. Sanders became concerned with these repeated requests and other concerning actions by Mr. Kriz. He asked Mr. Krause to terminate Mr. Kriz from CipherBlade PA.

64. On April 18, 2023, Mr. Krause sent a termination notice to Mr. Kriz using the "richard@cipherblade.com" email to do so instead of using his own email address, which Mr. Sanders found suspicious. Defendants did not have authority to use the richard@cipherblade.com email address account in this way.[1]

65. Mr. Kriz's termination was effective on April 30, 2023.

66. Mr. Sanders immediately messaged Mr. Krause saying, "This is a strange way of handling it, no? Why is only one entity mentioned? And why did it need to come from 'my' email, why could it not have been from Michael?"

---

[1] Defendant Manuel Kriz regularly went by the alias "Matthew" and Defendant Michael Krause is referred to here as "Michael."

67.     Mr. Krause assured Mr. Sanders that no one is trying to take advantage of him and explained that "if it comes from me, it does not have any effect."[2]

68.     On April 30, 2023, Mr. Sanders revisited the situation with Mr. Kriz, which Mr. Krause explained was "resolved."

69.     Mr. Kriz's termination was a charade. In fact, Mr. Kriz had not been terminated as Mr. Sanders had directed. Mr. Kriz continued to be involved with CipherBlade PA and conspired with the other Defendants to engage in this scheme. Mr. Sanders learned that Mr. Kriz was still actively involved in CipherBlade PA operations when Mr. Kriz's email account, which should have been shut down as part of the employee off-boarding process, was still accessing a CipherBlade PA spread sheet containing accounting and financial information. This concerned Mr. Sanders when he learned on or about June 2023 that Mr. Kriz was still working with an active email address after Mr. Sanders directed he be fired and after the termination charade.

70.     As part of the charade concerning the fake termination of Mr. Kriz, Mr. Krause announced to CipherBlade PA on May 1, 2023, that Mr. Kriz was no longer with CipherBlade. Mr. Krause announced this in a CipherBlade general operational group chat on Telegram. This caused concern among the team because they were not familiar with Michael, yet he was announcing large changes to the structure. *See* **Figure 2**.

_____

[2] "Doc27" is Mr. Krause's alias.

1 May 2023

 **Michael**                                        13:07

Memo

With this announcement I would like to inform you that Matthew Greene is no longer working for CipherBlade LLC as of today. CipherBlade LLC would like to thank Matthew for his active support as well as work performance since the very beginning.

By mutual agreement, Matthew has decided to pursue a more strategic professional direction with a different focus, and we wish him every success in this endeavor.

At the same time, we would like to mention that all inquiries and concerns originally directed at Matthew should now be addressed to Justin (OPS) and Jan (Sales/Customer Management), in order to allow the ongoing business processes to continue smoothly.

Michael

 **Miguel**                                        13:53

Let me recap the situation. We switched from a company in Pennsylvania to a company in Alaska, Rich is no longer the CEO, but Justin, who arrived a few weeks ago, as well as Jan who is going to lead sales, and Michael (with whom I've never had a conversation – no ill intent, it's just reality) announces that Matthew is leaving. At the same time we're swapping the sales app for Lawmatics, Harvest for Clockify, and I hear Telegram for Slack. Can someone reassure me on how this new setup is likely to work, given that those with hands–on experience at CipherBlade aren't here or have been delegated to investigative tasks? I feel like a bloody boring person now, for feeling disruptive this morning by wanting to wear coloured clothes.

**Sasha**                                              13:59

agreed

 **Paul**                                          14:01

In reply to this message

Jesus Christ, I didn't realize the situation was that bad. Someone better start talking about what the fuck is going on, and why it's going on.

**Justin**                                             14:23

Let me reassure everyone. The situation is not bad. Things are changing because we are growing aggressively and we have to evolve in order to efficiently support that growth. One of the elements of that growth is creating new business units to align with business functions: civil case litigation and industry partnerships under the AK entity, criminal investigations and compliance with an APAC nexus under the new APAC entity that Jussi is leading, and the future EMEA entity that will lead law enforcement liaison and global incident response, and the PA entity will remain to continue to handle criminal cases and some long term clients. All entities will exist simultaneously and

**Figure 2**

COMPLAINT
Cipherblade LLC v. Cipherblade, LLC et al., Case No. 3:23-cv- _____
Page 18 of 62

71. Mr. Kriz left this CipherBlade PA general operational group chat on May 1, 2023, to give the appearance to Mr. Sanders that Mr. Kriz was no longer working at CipherBlade PA.

72. However, Mr. Kriz continued to engage in further efforts to steal and siphon off CipherBlade PA assets and infrastructure, redirecting them to himself and to the Alaska Entity in a conspiracy with Mr. Maile and other Defendants.

73. After Mr. Kriz's purported termination, Mr. Kriz authorized the transfer of a contract that CipherBlade PA had with one of its vendors, Filevine, a core component of CipherBlade PA's IT infrastructure. Specifically, on April 24, 2023, richard@cipherblade.com (which Mr. Sanders did not have access to) received an assignment contract seeking Mr. Sanders' signature and an email was then sent to matthew@cipherblade.com asking, 'any idea what this is about?' and Mr. Kriz responds "Yeah, it can be signed."

74. Mr. Maile went along with this ruse that Mr. Kriz was allegedly no longer working for CipherBlade PA and stated "*Matthew leaving is not my choice and I would have preferred to keep him on board since I have known him for years and have nothing but respect for his investigation skills and the time he has invested into keeping CipherBlade running. However, this decisions [sic] was between Michael, Rich, and Matthew.*" It is clear now that this was part of Defendants' plan to steal CipherBlade PA's business and its assets from Mr. Sanders.

Case 3:23-cv-00238-JMK   Document 1   Filed 10/19/23   Page 19 of 62

75.    Defendants converted or assigned various other CipherBlade PA IT infrastructure contracts as well, including those with Lawmatics and Freshdesk, all to the Alaska Entity, often using Mr. Sanders' forged signatures to effectuate these transfers. Lawmatics is a robust client intake application which helps companies track potential new clients from first contact to final client intake and is a *crucial* part of CipherBlade PA's business. The Defendants fraudulently gained access to this program and locked out Plaintiff. Thus, Plaintiff has no access to potential client leads and information. Freshdesk is a comprehensive customer portal that allows the user to organize and manage customer relationships across many touchpoints including email, phone, chat, and more. The Defendants now fraudulently have access to all of Plaintiff's customer interactions, which they have used to deceptively convert CipherBlade PA clients.

76.    Defendants then began contacting CipherBlade PA customers and contractors to re-negotiate contracts and agreements, purportedly on behalf of Mr. Sanders, but without Mr. Sanders' knowledge or authorization. These emails even included a picture of Mr. Sanders on the signature line.

77.    For example, on March 29, 2023, Defendants used the richard@cipherblade.com email address and Mr. Sanders' email signature to terminate an existing contractor agreement between Paul Sibenik and CipherBlade PA that, in turn, changed a previously agreed upon revenue sharing structure. Defendants sought to present this communication as coming from Mr. Sanders. This document was not from Mr.

Sanders, nor was Mr. Sanders aware that the Defendants emailed such an agreement to Mr. Sibenik.

78.     The Defendants also engaged in physical theft and impersonation outside of the digital world by engaging in theft of business documents, credit card fraud, and impersonating Mr. Sanders via federal mail.

79.     On at least one occasion, while abroad in Ukraine, Mr. Sanders received a series of alerts from his home security system that indicated all of his security cameras suddenly went offline. Upon returning home, Mr. Sanders observed that business registration-related documents, including LLC and business filings, were missing from his home. He found a U.S. Postal Service receipt for a package mailed by U.S. Mail from his home, fraudulently using his name and credit card information without permission, to an address in Cyprus.

80.     On information and belief, Mr. Janssen took documents from Mr. Sanders' home and mailed them to Cyprus, forging Mr. Sanders' name and using his personal credit card. Defendants' actions are in accordance with their pattern of exceeding their authorization in order to conduct their scheme.

**After Gaining Access to Mr. Sanders Email and Personal Information, Defendants Executed an Account Takeover to Steal the CipherBlade.com Domain from Mr. anders and CipherBlade PA's Control**

81.     On May 4, 2023 – four days after Mr. Kriz was supposedly terminated, he met with HiView – a vendor that manages CipherBlade PA's Google accounts. Mr. Kriz

did not have any authority to meet with any of CipherBlade PA's vendors given his termination from the company.

82.    CipherBlade PA uses Google Workspaces to issue and manage all email addresses associated with the cipherblade.com domain. Email accounts can be established with different administrator rights depending on the privilege level associated with the account in Google Workspaces.

83.    A regular user account has no administrative privileges to manage email addresses in Google Workspaces. An Administrator level account *does* have administrative rights. A Super Administrator level account is able to manage the functionality of the entire Google Workspaces platform, as well as control and manage the functionality of all Administrator accounts. Only a Super Administrator can change the level of an Administrator account – such as lowering its level from Administrator to a regular user with no elevated privileges in Google Workspaces.

84.    Mr. Sanders' authentic email address (rich@cipherblade.com) used to have administrator rights on Google Workspaces. However, he agreed to downgrade his account to simply Administrator privileges and grant [hq@cipherblade.com](mailto:hq@cipherblade.com) Super Administrator privileges.

85.    Unfortunately, that meant that Mr. Kriz had access to Super Administrator privileges by way of a shared email address hq@cipherblade.com – an email account he initially shared with Mr. Sanders as well.

86.     Despite this, Mr. Sanders did not share access to his real email address (rich@cipherblade.com) with the Defendants, so no one other than Mr. Sanders himself was able to access the contents of his email account.

87.     Mr. Sanders owned the cipherblade.com domain, which was registered in his name and linked solely to Mr. Sanders' real email address rich@cipherblade.com.

88.     On June 13, 2023, using the Super Administrator privileges, Defendants disabled the rich@cipherblade.com email address, thereby removing Mr. Sanders access to his company's website, related services, and any communications sent to his email address.

89.     Plaintiff's review of the email access logs associated with the rich@cipherblade.com account in fact indicate that on June 13, 2023, the Defendants disabled Mr. Sanders' access to the rich@cipherblade.com email address and then mysteriously restored that access later that same day.

90.     On information and belief, Defendants disabled Mr. Sanders' email access and executed an account takeover of Mr. Sanders' Namecheap account that held the cipherblade.com domain. In order to access the Namecheap account, the Defendants would have needed a Two-Factor Authentication (2FA) Secret code that would have been sent to Mr. Sanders' email.

91.     On information and belief, in order to get the 2FA secret code to access Mr. Sanders' Namecheap account, Defendants abused their access and created a mailing

forwarding rule that temporarily redirected emails sent to [rich@cipherblade.com](mailto:rich@cipherblade.com) to the Defendants, thus allowing them to obtain access to the 2FA secret code without Mr. Sanders' knowledge or consent. This was the purpose of temporarily disabling and then reenabling Mr. Sanders' email account on June 13, 2023.

92. Once the Defendants had access to Mr. Sanders' Namecheap account they proceeded to change the contact and account ownership information of the cipherblade.com domain from rich@cipherblade.com to billing@cipherblade.com. Only the Defendants had control and access to the billing@cipherblade.com email address. This change allowed Defendants to perform an account takeover (ATO) and steal the cipherblade.com domain from Mr. Sanders. *See* **Figure 3**.



**Figure 3**

93.     Because of this maneuver, the Defendants have stolen control of the cipherblade.com website and domain name, and usurped control of all domain management functionality from CipherBlade PA.

94.     Since this fraudulent account takeover, Plaintiff and Mr. Sanders have not been able to regain control over the cipherblade.com domain.

95.     On or before June 16, 2023, the Defendants changed the login credentials for the hq@cipherblade.com account so that Mr. Sanders had no administrative privileges whatsoever, and no ability to assess or control the Defendants' subsequent actions. Because of the Defendants' well-planned scheme and misrepresentations, as of this moment, Mr. Sanders still has no administrative privileges to his own company.

96.     On July 3, 2023, Plaintiff's counsel provided Defendants' counsel with a courtesy copy of the Complaint filed in the SDNY on June 30, 2023. The relief requested in the Complaint included the return of the cipherblade.com domain.

97.     That same day, July 3, 2023, Defendants utilized their illicit access to the stolen registrar account and transferred the domain from a U.S.-based registrar to a domain name registrar located in France. 'Whois' data from the Domain Name System shows the exact date and time that Defendants updated and transferred the domain.

98.     Also, on July 3, 2023, the Defendants altered the ownership information of the domain. The Defendants changed the owner of the domain to "omega3zone Global Ltd." and changed the registrant country to Cyprus.

99. After gaining access to CipherBlade PA's Domain and the related functions, Defendants, without authorization, usurped control of the remaining CipherBlade PA-controlled IT infrastructure, through various unauthorized actions and the abuse of administrator privileges; these unauthorized actions were in addition to the theft of the infrastructure that the Defendants had fraudulently assigned in the months prior from CipherBlade PA to the Alaska Entity. Furthermore, Defendants locked out and/or heavily restricted access to critical company infrastructure for other CipherBlade PA contractors who had raised questions and sought justification from Defendants for their activities.

100. In addition to taking control of the CipherBlade PA domain name, Defendants also took control of the CipherBlade PA's web hosting account with Google, the customer relationship management (CRM) tools to respond to inbound inquiries, as well as the backend IT infrastructure that is hosted with Google Workspaces, which grants contractors email access.

101. After gaining access to the infrastructure, the Defendants revoked access to CipherBlade PA IT infrastructure for Mr. Sanders as well as CipherBlade PA contractors not part of Defendants' conspiracy.

102. Defendants then used this access to illegally convert proprietary information, confidential information, and trade secrets, including, confidential client leads, confidential

client information, confidential investigation case files, and proprietary investigation techniques and protocols.

103.   Specifically, the Defendants are in possession of Plaintiff's confidential workflows and investigative protocols. The Defendants are accessing and using Plaintiff's protocols, which Plaintiff developed over many years, without authorization. This includes optimized procedures and steps to take throughout the course of an investigation. It also includes confidential contacts of various parties that Plaintiff has obtained over years and has used during the course of its investigations in service to its clients.

104.   The Defendants have also misappropriated proprietary data, work product, investigative findings, and various reports that Plaintiff produced over several years, some of which represent work and communications with counsel concerning investigation and are subject to attorney-client privilege. Defendants have used this data to solicit and fraudulently convert clients of CipherBlade PA to the Alaska Entity.

105.   Defendants are currently in possession of many confidential cryptocurrency addresses that Plaintiff has marked, labelled, and attributed over past years.

106.   Furthermore, Defendants are in possession of confidential and proprietary sales processes, sales statistics, and client onboarding policies and procedures that Plaintiff has developed and adjusted over many years.

107.   Defendants have also converted Plaintiff's cloud assets including confidential and trade secret business and customer information on these computer

Case 3:23-cv-00238-JMK   Document 1   Filed 10/19/23   Page 27 of 62

systems.

108. Furthermore, CipherBlade PA had been paying the costs of this infrastructure, which the Alaska Entity and the Singapore Entity were using while siphoning existing and prospective CipherBlade PA clients as part of their scheme.

### CipherBlade PA and Mr. Sanders Appoint a New CEO – Paul Sibenik

109. Paul Sibenik was hired at CipherBlade in September 2019. He was the Lead Case Manager and the most senior full-time investigator at the company. He has often been called upon as an expert in cryptocurrency-related investigations and resulting cases.

110. After CipherBlade PA hired Mr. Sibenik in 2019, his responsibilities increased over time. Mr. Sanders, principal and founder of CipherBlade PA, expanded the scope of his work to include overseeing more business and operational tasks.

111. Once the theft began to be uncovered, on June 16, 2023, Mr. Sanders transitioned the role of CEO to Mr. Sibenik.

### After Defendants Gained Access to CipherBlade PA's Systems, Defendants Made Misrepresentations to Customers in an Effort to Move CipherBlade PA's Existing and Prospective Customers to Fraudulent Entities

112. Defendants confused customers by making misrepresentations about CipherBlade's location in Pennsylvania, changed the cost of services, and wrongfully converted CipherBlade PA customers and transferred them to the Alaska Entity.

113.   Defendants have used the converted domain and website to make false statements of material fact in advertising about their services. This includes passing off the experience, expertise and tools of Plaintiff as their own. The website further contains a section titled "In the Press," that includes Mr. Sanders' and Mr. Sibenik's media and press appearances (https://cipherblade.com/in-the-press/) .

114.   The CipherBlade website contained various blogs with posts written primarily by Mr. Sibenik for the Plaintiff, but Defendants initially removed his name as author and subsequently misleadingly listed 'CipherBlade' as an author. However, Defendants have since removed these blog posts, but only after the filing of the Amended Complaint in New York on July 18th, 2023. The website also falsely makes claims about Defendants' experience that are in fact the experience of Plaintiff. Indeed, it falsely claims that Defendants have recovered millions of dollars of stolen cryptocurrency and have investigated and tracked Bitcoin belonging to suspects in hundreds of cybercrime cases. This is the experience of Plaintiff. Finally, the website makes the false claim that Defendants "have also served in the capacity of a credential expert witness and can provide testimony in a court of law." This, once again, is Plaintiff's experience and not that of Defendants. Defendants have not been a witness in any litigation.

115.   Defendants locked Plaintiff and its employees out of their accounts and then began to ruin relationships with existing clients by circulating misrepresentations directly to clients in an effort to malign the reputation of CipherBlade PA and its founder, Mr.

Sanders.

116.    For example, on July 3, 2023, after locking Mr. Sibenik out of his email, the Defendants replied to an inquiry from one of Mr. Sibenik's long-time clients. In that response the Defendants stated "Regrettably, CipherBlade has had to separate from its Pennsylvania unit due to increasingly erratic and unconscionable behavior by representatives of the same, including threats of violence and other harm . . ." This claim is patently false and completely fabricated.

117.    Defendants also damaged communications and relationships with prospective clients. For example, on July 3, 2023, a prospective CipherBlade PA customer emailed Mr. Sibenik directly to ask about his services and explained, "Lost contact with you when something happened at CipherBlade a week ago Sunday."

118.    On July 4, 2023, a client emailed Mr. Sibenik explaining that, "Yes, when I couldn't reach you, I reached out to HQ at cipher blade [sic] and they were professional and told me there was an issue with the Pennsylvania office etc. And not related to you personally."

119.    Defendants also began accepting payments which clients believed were being sent to CipherBlade PA.

120.    In July 2023, one CipherBlade PA client sent Plaintiff a communication on Telegram, a secure messaging app CipherBlade PA uses, explaining, "I don't understand how we paid the wrong CipherBlade group when I specifically asked for Paul, and they

said you don't work for them anymore. This is very frustrating because I don't know who to believe and y'all are from the same company." This CipherBlade PA client, as a result of Defendants' misrepresentations, mistakenly paid the Alaska Entity $30,000 USD instead of CipherBlade PA, with which they assumed they were engaging.

121.    This CipherBlade PA client then wrote to Mr. Sibenik explaining, "we just paid them 30k and they are refusing a refund how do I justify paying the same company another 20k for another team to do the first teams job." The CipherBlade PA client continued, evidencing the harm now being caused Plaintiff, "we went to the FBI, and they told us this was the best route."

122.    The Defendants also engaged in slanderous misrepresentation in an effort to capture existing CipherBlade PA clients. For example, on June 22, 2023, an active CipherBlade PA client messaged Mr. Sibenik questioning if he was separating from CipherBlade. The client forwarded a message from an employee of the Alaska Entity in which he represents that "CipherBlade has had to separate from its Pennsylvania unit, comprising Richard, Paul, and Sasha." This message makes additional disparaging remarks about Mr. Sibenik, Mr. Sanders and another CipherBlade PA employee not involved in the scheme, Nevena Lazić (otherwise referred to as "Sasha") and requests that the client contact his CipherBlade email in the future.

123.    Defendants' misrepresentations and fraudulent activities have directly resulted in the loss of client engagements.

124.    On June 5, 2023, CipherBlade PA entered into an Engagement Agreement with a citizen of the United Kingdom. The client engaged CipherBlade PA to perform investigative and expert services in the domain of blockchain forensics and cryptocurrencies.

125.    The contract included a deposit of $11,250 USD.

126.    The client attempted to conduct additional business with CipherBlade PA and attempted to reach Mr. Sibenik at his paul@cipherblade.com email address, however, due to Defendants' fraudulent takeover and subsequent restriction of CipherBlade PA's employee's privileges, Mr. Sibenik no longer had access to his work email.

127.    Defendants' subsequent misrepresentations and false narratives to the client led to the client's withdrawal of their engagement with CipherBlade PA on July 12, 2023.

128.    Defendants have stolen or converted many CipherBlade PA clients and prospective clients. Another example of a converted CipherBlade PA client is Aylstock, Witkin, Kreis & Overholtz PLLC. Mr. Sanders' email signature was forged using the richard@cipherblade.com email address to authorize the assignment of this client from CipherBlade PA to the Alaska Entity.

**Defendants Stole Funds from CipherBlade PA
Using the Fraudulent CipherBlade Entities and Shell Companies**

129.    Not only were the Defendants actively working to steal trade secrets, proprietary information and clients from CipherBlade PA, the Defendants were actively

Case 3:23-cv-00238-JMK   Document 1   Filed 10/19/23   Page 32 of 62

stealing and misappropriating funds from CipherBlade PA.

130.    Mr. Kriz and Mr. Krause had access to the CipherBlade PA Wise financial accounts, which they unfortunately used to siphon and misappropriate funds.

131.    CipherBlade PA has business accounts with Wise, a money services provider that focuses on holding and converting currencies. CipherBlade PA has accounts in five different currencies, including U.S. dollars (USD), Euro (EUR), the British Pound (GBP), Australian dollar (AUR), and Canadian dollar (CAD). For every currency, CipherBlade LLC in Pittsburgh, PA is listed as the account holder. Here, relevant transactions were made from USD, EUR, and GBP accounts.

132.    CipherBlade PA does not pay for consulting or advisory services. However, upon review of CipherBlade PA's financial records, several transactions to unknown companies, that appear to be consulting or advisory service companies, were discovered.

133.    Plaintiff discovered that in 2022, $119,502.60 was transferred from CipherBlade PA to White Orchard Ltd. White Orchard is a company owned by Defendant Manuel Kriz, which was used to illegally transfer funds.

134.    CipherBlade PA investigated these charges and established it never entered into a contract with White Orchard Ltd.

135.    Plaintiff discovered that in April 2023, $110,230.09 (USD) and €245,675.91 (EUR) was transferred from CipherBlade PA to Inquisita Solutions Ltd, a Cyprus-based company, of which Mr. Kriz is a director.

136.    CipherBlade PA investigated these charges and established it never entered into any contract with Inquisita Solutions.

137.    CipherBlade PA discovered that in 2022, $435,199.59 (USD) was transferred from CipherBlade PA to Green Stone Advisory FZ-LLC ("Green Stone"). In 2023, $716,342.85 (USD) was transferred to the same entity. Green Stone is a shell company connected to the Defendants.

138.    CipherBlade PA investigated these charges and established it never entered into a contract with Green Stone.

139.    Defendants also sent funds to the fraudulent CipherBlade entities.

140.    Upon review of CipherBlade PA's financial records it was discovered that in 2023, after Mr. Sanders departed for Ukraine, $24,700 USD was transferred to the Singapore Entity.

141.    There were likewise unauthorized monetary transfers from CipherBlade PA to Alaska Entity with a net amount sent of $15,843.72 USD.

142.    Overall, Defendants wrongfully transferred at least **$1,405,975.13 (USD) and € 245,675.91 (EUR)** (approximately $276,131.86) to Green Stone, White Orchard Ltd., the Singapore Entity, and Inquisita Solutions.

143.    After Mr. Sanders left for Ukraine, the Defendants attempted to memorialize the theft with fraudulent agreements.

144. Specifically, on April 18, 2023, the Defendants forged Mr. Sanders' signature on two fake "Amended and Restated Contractor Agreement[s]" with Inquisita Solutions Ltd, and Green Stone Business Advisory FZ-LLC. CipherBlade PA and Mr. Sanders had no knowledge of these agreements and Mr. Sanders did not sign them.

145. Importantly, no original contracts exist. The Defendants fraudulently created "Amended and Restated" Agreements after Mr. Sanders left for Ukraine and was out of the picture, to give the illusion that original contracts existed.

146. The richard@cipherblade.com email address, to which Mr. Sanders did not have access, was again used to forge Mr. Sanders' signature in both cases. Manuel Kriz was the signatory for both these companies.

147. The alleged agreements are notable for another reason: they were both executed on the day Mr. Kriz was purportedly terminated – April 18, 2023.

148. If Mr. Kriz was terminated on April 18, 2023, as represented to Mr. Sanders and at his request, it is highly unlikely that Mr. Sanders would then sign contracts for hundreds of thousands of dollars with companies controlled by Mr. Kriz on the same day of his termination notice. Mr. Sanders was in Ukraine at the time and did not see, sign or authorize these fraudulent contracts.

149. Even the substance of the contracts makes it clear that they are fraudulent. Section 3c of these contracts includes the following verbiage:

> "The Company [CipherBlade PA] is not entitled to terminate the Agreement unilaterally."

150. These alleged 'Amended and Restated' contracts of course imply that prior contracts existed. However, no original contracts exist.

151. Mr. Sanders and CipherBlade PA have no knowledge of these contracts.

152. On April 25, 2023, Defendants used the richard@cipherblade.com email address to send an email that included Mr. Sanders' email signature to AABI Chartered Accountants, an accounting firm located in the United Arab Emirates. The email contained an attachment that purportedly showed alleged balances that CipherBlade PA had allegedly owed and paid to Green Stone. The attachment includes the signature of Mr. Kriz as a 'Manager' of Green Stone. The attachment also includes Mr. Sanders' signature. However, Mr. Sanders did not sign this document, never had any knowledge of it, and CipherBlade PA never had any contract with Green Stone.

153. Defendants forged countless documents and contracts, including many documents with the IRS. However, one very pertinent forged document to note is a Power of Attorney document where Mr. Sanders' signature was forged, that authorized Gusto Inc to handle various tax matters on behalf of CipherBlade PA. Mr. Sanders did not sign this document and was not aware of this document.

**<u>Defendants Engaged in Criminal Activity and Operated a Racketeering-Style Enterprise Scheme to Steal Funds, Trade Secrets and Clients from CipherBlade PA</u>**

154. On June 16, 2023, Mr. Sibenik, the CEO of CipherBlade PA, became aware that there was a 'hostile takeover' of CipherBlade PA. He found that Defendants had

discreetly been orchestrating considerable changes in the weeks and months prior. In this time period, for example, they perpetuated the false narrative that Mr. Sanders approved of business contracts being transferred from CipherBlade PA to the Alaska Entity, when in fact that was accomplished by falsely representing to Mr. Sanders that the Alaska Entity would be set up as owned by Mr. Sanders.

155. Defendants bribed existing CipherBlade PA staff with inexplicable, discretionary bonuses in an effort to get them to assign their contracts to the Alaska Entity to give the illusion that this transfer was legitimate.

156. As described above, Mr. Kriz encouraged multiple CipherBlade PA contractors to send invoices for large bonuses to be paid by CipherBlade PA, in an attempt to curry favor with them, days before their contractor agreements were fraudulently assigned to the Alaska Entity. This includes CipherBlade PA senior investigator 'Josh.' Mr. Kriz claims this is an "annoying administrative matter" and that "they are restructuring by gradually moving CB from Pennsylvania to Alaska (to make it less dependent on Rich's living situation, as per his wish.) The way you do that in the US is that you just set up a new entity of the same name in a different state and then assign all your business." *See* **Figure 4**.

**Figure 4**

157. In an effort to convince Josh to assign his contract, Mr. Kriz asked him to send an invoice for a $20,000 bonus (on top of a $25,000 bonus that was also sent to him a few days prior, ergo $45,000 total) and states "this needs to be handled before your employer might change to a different entity." Josh asks, "why am I sending another invoice" to which Mr. Kriz responds, "cause we want to send you money and has to come from old company since that one has money, while the new one doesn't." **Figure 5.**



**Figure 5**

158. Likewise, 'Miguel,' another now-former senior CipherBlade investigator was also paid a $30,000 USD bonus using CipherBlade PA assets on April 15, 2023, in a very similar manner to Josh. Mr. Kriz asks Miguel to send an invoice stating, "discretionary bonus as agreed." This is a reoccurring theme where Defendants ask CipherBlade PA staff to send them invoices to give the air of legitimacy.

159. Mr. Kriz even states to Miguel, "Don't bite the hand that feeds you, as they say."

160. Defendants also converted CipherBlade PA's corporate assets by making payments to themselves, making the payments as vendor payments to entities controlled by Defendants. For example, Defendants transferred CipherBlade PA funds in a series of transactions captured as "Management Services" and "Consulting." These payments were made from CipherBlade PA's Wise business account to a shell company called Inquisita Solutions Ltd. in multiple instances across the month of April 2023 and just days before Mr. Kriz was fired from CipherBlade PA. According to Inquisita Solutions Ltd.'s records, the entity's Director and Secretary are listed as Mr. Kriz and Mr. Janssen. Defendants also have asserted control, without authority, over some of CipherBlade PA's cryptocurrency assets.

161. Defendants actively engaged in a series of unauthorized and unlawful activities that sought to undermine the control and ownership of CipherBlade PA. Defendants also perpetuated their efforts by abusing the access Mr. Sanders granted them

Case 3:23-cv-00238-JMK   Document 1   Filed 10/19/23   Page 40 of 62

to his home while he was away in Ukraine, including the theft of CipherBlade PA corporate documents from his home.

162. While abroad in Ukraine, Mr. Sanders received a series of alerts from his home security system that indicated all of his security cameras suddenly went offline. Upon his return home, he observed that business registration related documents, including LLC and business filings, were missing.

163. Furthermore, Mr. Sanders discovered a U.S. Postal Service receipt for a package purportedly mailed from his home, fraudulently using his name and credit card information without permission, sent to an address in Cyprus. On further inspection of the receipt, the package was addressed to Mr. Marnitz, Mr. Krause's son, in Cyprus.

164. Mr. Krause is no stranger to the above-mentioned types of financial theft, criminal enterprise, and associated violence, evidenced by his six-year prison sentence for the theft of 3.7 million Euros from the German textile discounter, NKD. Furthermore, Mr. Krause was subsequently sentenced for his attempt to persuade two members of the Russian Mafia in the Czech Republic to kidnap and murder Judge Bösemesser, who was presiding over his case. Krause has been identified as being involved in 3 murders attempts for hire.

165. The CipherBlade US Trademark was transferred from CipherBlade Ltd to Defendant Omega3Zone Global Ltd on March 3, 2023, which is a Cyprus based company which Defendant Marnitz and Defendant Vidrasan are directors of.

166. Mr. Kriz signed on behalf of CipherBlade Ltd, while Defendant Paul Marnitz, Mr. Kriz's son, signed on behalf of Omega3Zone Ltd.

167. Mr. Sanders was a director of CipherBlade Ltd. CipherBlade PA had a license to use the CipherBlade trademark with CipherBlade Ltd. However, the trademark transfer was done without Mr. Sanders' consent or even his knowledge shortly after he left for Ukraine.

168. Also, on March 3, 2023, a positive reference letter was penned using the richard@cipherblade.com email address for Mr. Kriz, using his real name (rather than his alias Matthew Greene).

169. The positive reference was not penned by Mr. Sanders, and contains numerous inaccuracies about Mr. Kriz's involvement with CipherBlade PA. For one, Mr. Kriz only started working with CipherBlade PA in March 2021, and only started working with CipherBlade Ltd in or around July 2019. Mr. Kriz did not work for CipherBlade PA since February 2019 as is suggested in the letter.

170. Rather, Defendant Kriz penned his own positive reference letter, and then sent it to the richard@cipherblade.com email address for signature, stating "Please sign via Dropboxsign or whatever and send back to me."

171. Upon information and belief, Defendant Kriz subsequently sent this positive reference letter to Steven War of War IP law, which is the attorney that processed the trademark transfer with the US Patent and Trademark Office. Thus, Defendant Kriz drafted

Case 3:23-cv-00238-JMK   Document 1   Filed 10/19/23   Page 42 of 62

this inaccurate positive reference letter himself in Mr. Sanders' name to induce Mr. War's signature to process the trademark transfer to Omega3Zone Global Ltd.

172.    At the time of the trademark transfer, CipherBlade PA's address and company name were the only ones listed on the cipherblade.com website.

## CAUSES OF ACTION

## COUNT I

## MISAPPROPRIATION OF TRADE SECRETS,PURSUANT TO THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836

173.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

174.    Plaintiff is the owner of trade secrets and confidential information, which includes proprietary investigative techniques and processes and information concerning specific clients and matters as well as new prospective clients and matters. The trade secrets and confidential information are intended for use in interstate and/or foreign commerce, including in the execution of business contracts for conducting blockchain investigations and tracking of Bitcoin and other cryptocurrencies in cybercrime cases.

175.    Plaintiff's trade secrets and confidential information derive independent economic value from not being known to the public or other persons who could obtain economic value from their disclosure or use.

176.    Plaintiff takes reasonable measures under the circumstances to keep their trade secrets and confidential information confidential.

177. Defendants misappropriated Plaintiff's trade secrets and confidential information by wrongfully obtaining them through fraudulent and other unlawful acts and/or using Plaintiff's trade secrets and confidential information wrongfully obtained.

178. Plaintiff identified repeated instances of misappropriation by Defendants, including those described above.

179. Defendants know or should know that Plaintiff's trade secrets and confidential information were acquired by improper means.

180. Defendants have improperly disclosed and/or used Plaintiff's trade secrets and confidential information after improperly acquiring them.

181. Defendants have caused and continue to cause Plaintiff damages and irreparable injury.

182. Plaintiff is entitled to a monetary award under 18 U.S.C. § 1836, including damages to Plaintiff and any diminution in the value of its Trade Secrets and Confidential Information, and the unjust enrichment of Defendants arising from Defendants' misappropriation.

183. Defendants' misappropriation is reckless, willful, and malicious and thereby entitles Plaintiff to an award of exemplary damages, as well as attorneys' fees.

184. Defendants' misappropriation of Plaintiff's trade secrets and confidential information has caused and will continue to cause Plaintiff irreparable and substantial injury and therefore cannot be fully redressed through damages alone. An injunction

prohibiting Defendants from misappropriating, using, or disclosing Plaintiff's trade secrets and confidential information in any manner, and ordering that Defendants permanently destroy any of Plaintiff's trade secrets and confidential information in their possession, custody, or control, including any materials that were in any way derived from Plaintiff's trade secrets and confidential information, is necessary to provide Plaintiff with complete relief.

**COUNT II**

**COMPUTER FRAUD AND ABUSE ACT, 18 U.S.C. § 1030 *et seq.***

185.    Plaintiff repeats and reallege each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

186.    Defendants wrongfully and intentionally, without authority, accessed protected CipherBlade PA accounts in order to take control over essential CipherBlade PA assets, such as its domain name, and to gain full administrator rights over CipherBlade PA's IT infrastructure, on which CipherBlade PA's trade secrets and confidential information resides, and from which Defendants absconded with information, account credentials, and funds, all without authorization.

187.    These actions were unauthorized because Defendants never had authority to transfer assets or take over full administrative rights on these accounts, especially to the point of excluding the CipherBlade founder, Mr. Sanders, from access to his accounts.

188.    As a direct and proximate result of Defendants' conduct in violation of the

CFAA, CipherBlade PA has suffered and will continue to suffer damages in excess of $5,000.

189.    As a direct result of Defendants' actions, Plaintiff suffered and continues to suffer irreparable harm for which there is no adequate remedy at law, and which will continue unless Defendants' actions are enjoined.

## COUNT III

## UNFAIR COMPETITION, 15 U.S.C. § 1125(a)

190.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

191.    Defendants have taken over CipherBlade, and made false and misleading statements to promote their services, on information and belief, that pass off the experience, expertise and tools of Plaintiff as their own and that falsely disparage Plaintiff and its services as part of Defendants' scheme to steal customers and customer leads and to promote their services in the marketplace by false statements to the detriment of Plaintiff. Defendants have made these statements in connection with their services provided in interstate commerce.

192.    Defendants' statements are false and misleading because they are passing themselves off as having Plaintiff's expertise and experience in its investigative and/or expert witness services among Plaintiff's customers, partners and in the marketplace.

193.    Defendants made these false and misleading statements on their website, to

Plaintiff's customers and in the marketplace knowing they were false and misleading and made in bad faith to mislead Plaintiff's customers, partners and the marketplace for such investigative and expert witness services.

194.   Defendants' statements are likely to confuse or deceive a substantial segment of its audience in the marketplace for such investigative and expert witness services, and this deception is material, in that it is likely to influence customers' decisions about whether to engage Defendants or Plaintiff.

195.   Defendants' false and misleading statements constitute unfair competition under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Defendants' false and misleading statements tend to harm, have harmed, and will continue to harm Plaintiff and its business relationships, the conduct of its business, and its ability to obtain and maintain sales and business relationships.

196.   Plaintiff has been and is likely to be injured as a result of the false and misleading statements, either by direct diversion of sales or by a lessening of the goodwill associated with its products. Plaintiff is and has been irreparably damaged in its business or property by Defendants' false and misleading statements, and unless Defendants' false and misleading statements are enjoined by this Court, Plaintiff will continue to suffer monetary damage, market price erosion, loss of market share, lost sales, and irreparable harm to its reputation, relationships, and goodwill with its customers, partners, vendors, distributors, industry professionals, and others.

# COUNT IV

## TORTIOUS INFERENCE WITH CONTRACTS

197.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

198.    Despite this knowledge, Defendants endeavored to convert business relationships to entities in Alaska and Singapore under the false pretense of being the same existing Plaintiff. Defendants sought to confuse clients, contractors, and vendors inducing them to break contract with Plaintiff.

199.    In other situations, Defendants actions confused clients, impacting their payment and causing irreparable harm. For example, in the chats with a CipherBlade PA client, the client stated "I don't understand how we paid the wrong CipherBlade group when I specifically asked for Paul, and they said you don't work for them anymore. This is very frustrating because I don't know who to believe and y'all are from the same company."

200.    Defendants knowingly interfered with Plaintiff's contracts with customers, contractors, and vendors. As a result of Defendants actions, Plaintiff has suffered actual damages as well as irreparable damage to its reputation as a business.

## COUNT V

## TORTIOUS INFERENCE WITH BUSINESS ADVANTAGE

201.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

202.    Defendants maliciously interfered with Plaintiff's business relationships, including actively soliciting businesses to transition from Plaintiff to the Alaska Entity. Defendants also interfered with business relationships through the direct outreach to clients and circulating false and negative statements about Plaintiff in order to convert Plaintiff's business to the Alaska Entity. This includes not only corporate clients but individual clients as well.

203.    Defendants acted wrongfully and purposefully when they interfered with Plaintiff's business relationships in order to avail themselves of the business benefit associated with those relationships. Defendants were also dishonest in holding themselves out to have the experience and expertise of Plaintiff and perpetuating an inaccurate narrative about Plaintiff to all of Plaintiff's business relationships. Moreover, Defendants' active effort to disable the CipherBlade PA email addresses, without notice, prevented CipherBlade PA from being able to retrieve any email correspondence from customers.

204.    Defendants' acts injured the Plaintiff's relationship with its clients and business partners. In particular, Plaintiff lost the engagement with at least one client as a result of Defendants' activities. Defendants' activities directly prevented Plaintiff from

continuing with the customer's business relationship. Plaintiff was unable to access their official CipherBlade PA email addresses in order to continue communications with clients. Due to the Plaintiff's non-responsiveness and subsequent misrepresentations by the Defendants, Plaintiff lost the engagement. But for Defendants' actions, Plaintiff would have been able to continue providing investigative services to the client.

205.   Plaintiff is entitled to recover compensatory and punitive damages from Defendants in an amount to be determined at trial.

## COUNT VI

## CONVERSION

206.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

207.   Defendants knew or should have known that taking trade secrets and confidential information, as well as funds and other assets, was prohibited and unlawful.

208.   At all relevant times, Plaintiff owned the trade secrets and confidential information contained in writing and on Plaintiff's IT infrastructure, as well as the funds and other converted assets.

209.   Defendants have willfully taken and exercised unlawful and unauthorized dominion and control over trade secrets and confidential information, funds and other converted assets, including for their personal use and/or through disclosure to third parties.

210. Defendants converted and/or will continue to convert the trade secrets and confidential information, funds and other converted assets for their own use and financial gain and without authorization or consent from Plaintiff.

211. As a direct and proximate cause of Defendants' conversion of the trade secrets and confidential informaiton, funds and other converted assets, Plaintiff has incurred and continue to incur damages and irreparable injury, including without limitation, lost value and potential profits it would have earned but for Defendants' unlawful actions.

212. Plaintiff is entitled to recover compensatory and punitive damages from Defendants in an amount to be determined at trial.

213. Defendants' conversion of the trade secrets and confidential information, funds and other converted assets has caused and will continue to cause Plaintiff irreparable and substantial injury and therefore cannot be fully redressed through damages alone. An injunction prohibiting Defendants from using, disclosing, or relying on the trade secrets and confidential information in any manner or using or further transferring the funds and other converted assets, and ordering that Defendant permanently destroy any of the trade secrets and confidential information in his possession, custody, or control, including any materials that were in any way derived from the trade secrets and confidential information, is necessary to provide Plaintiff with complete relief.

## COUNT VII

## TRESPASS TO CHATTEL

214.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

215.    Defendants have used a computer and/or computer network, without authority, with the intent to cause injury to the property of another.

216.    Defendants have used a computer and/or computer network, without authority, with the intent to trespass on the computers and computer networks of Plaintiff.

217.    Defendants' actions in operating the Alaska Entity and acting in concert to grant the Alaska Entity use and access to Plaintiff's assets involved Defendants accessing and misappropriating CipherBlade PA's accounts and IT infrastructure, on which CipherBlade PA's trade secrets and confidential information resides, and from which Defendants absconded with information, account credentials, and funds.

218.    Defendants' actions have caused injury to Plaintiff and have interfered with the possessory interests of Plaintiff over its accounts, software, IT infrastructure and others assets and funds.

219.    Plaintiff seeks injunctive relief and compensatory and punitive damages in an amount to be proven at trial.

220.    As a direct result of Defendants' actions, Plaintiff has suffered and continue to suffer irreparable harm for which there is no adequate remedy at law, and which will

continue unless Defendants' actions are enjoined.

## COUNT VIII

### FRAUD

221.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

222.    On information and belief, Defendants' primary objective was to commit a hostile takeover of Plaintiff's business, acting by and through the Alaska Entity to transfer monies and other assets required to conduct the business of CipherBlade from Plaintiff to the Alaska Entity for the benefit of all Defendants and by which Defendants all have and will continue to collect money to which they are not entitled through their operation of the CipherBlade business through the Alaska Entity.

223.    Defendants have taken over accounts and IT infrastructure on client relationships to which they are not entitled.

224.    Defendants also committed fraud when they exceeded their limited administrative access and authority to convert trade secrets and confidential information, such as employee and business contracts, to their control. Defendants represented that Mr. Sanders approved of the actions taken. He did not. For example, on information and belief, Defendants forged Mr. Sanders' signature on contracts assigning CipherBlade PA contractors to the Alaska Entity. While the Defendants claim Mr. Sanders signed this document, the Internet Protocol (IP) address it was signed from geolocates to Pennsylvania

during which time Mr. Sanders was located in Ukraine.

225.    Defendants took control of CipherBlade PA's domain and changed contact information on the website from Pennsylvania to the entities in Alaska and Singapore, wrongfully representing themselves as the appropriate points of contact. Defendants do not have and have never had authority to control the CipherBlade PA domain.

226.    Defendants also used Mr. Sanders' email to contact customers and business contacts on behalf of and as Mr. Sanders himself. Defendants knowingly contacted others using Mr. Sanders' name to induce confusion from customers and business contacts, misrepresenting Mr. Sanders' actions and beliefs at that time.

## COUNT IX

### UNJUST ENRICHMENT

227.    Plaintiff repeats and reallege each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

228.    The acts of Defendants complained of herein constitute unjust enrichment of the Defendants at the expense of Plaintiff in violation of the common law. Defendants used, without authorization or license, software, information, and infrastructure belonging to Plaintiff to facilitate unlawful conduct inuring to the benefit of Defendants.

229.    Defendants profited unjustly from their unauthorized and unlicensed use of Plaintiff's intellectual property.

230. Upon information and belief, Defendants had an appreciation and knowledge of the benefit they derived from their unauthorized and unlicensed use of Plaintiff's intellectual property.

231. Retention by the Defendants of the profits they derived from their malfeasance would be inequitable.

232. Plaintiff seeks injunctive relief and compensatory and punitive damages in an amount to be proven at trial, including without limitation disgorgement of Defendants' ill-gotten profits.

233. As a direct result of Defendants' actions, Plaintiff suffered and continue to suffer irreparable harm for which there is no adequate remedy at law, and which will continue unless Defendants' actions are enjoined.

## COUNT X
### VIOLATION OF RICO, 18 U.S.C. § 1962(C) and (D)

234. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

235. At all relevant times, CipherBlade PA was a "person" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c) and (d).

236. At all relevant times, the Defendants were "persons" within the meaning of RICO, 18 U.S.C. §§ 1961(3) and 1964(c) and (d).

237.    As alleged above, the RICO Defendants are each comprised of natural persons and of corporate entities that they formed to carry out the unlawful activities described above.

238.    The Defendants are each comprised of natural persons and of corporate entities that are formed to carry out the unlawful activities described above. They have continuously and effectively carried out their purpose of taking over the CipherBlade PA's IT infrastructure, including the domain name and website registrar. The Defendants have used the misappropriated infrastructure and other converted assets and funds in the furtherance of the scheme to steal current clients and divert future clients to the Defendants. This association-in-fact of the Defendants was a continuing and cohesive unit with specific and assigned responsibilities separate from the pattern of racketeering. This association-in-fact of the Defendants had the purpose of converting Plaintiff's business by fraudulently transferring converted assets and funds to the Alaska Entity for the benefit of all Defendants, and is further characterized by relationships between the Defendants and a longevity of the association-in-fact sufficient to pursue its purpose to the benefit of each Defendant. This association-in-fact of the Defendants constitutes an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).

239.    Each RICO Defendant, by engaging in the acts set forth above, participated in the operation and management of the enterprise. At all relevant times, this enterprise was engaged in, and its activities affected, interstate and foreign commerce, within the

meaning of RICO, 18 U.S.C.§ 1962(c).

240.    Each RICO Defendant, by engaging in the acts set forth above, conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(1) and (5), in violation of RICO, 18 U.S.C. § 1962(c), and each participated in a conspiracy to do so in violation of 18 U.S.C. § 1962(d).

241.    The RICO Defendants, on numerous occasions, and in furtherance of their scheme to defraud and to obtain money by means of false and fraudulent pretenses, knowingly: (1) repeatedly disseminated information to customers and potential customers through the misappropriated cipherblade.com website, (2) used CipherBlade PA's IT infrastructure to leverage those clients and exclude CipherBlade PA from them, (3) blocked CipherBlade PA's rightful access to its IT infrastructure, and (4) profited through operation of the misappropriated CipherBlade PA website and IT infrastructure in furtherance of Defendants' common financial interest.

242.    The RICO Defendants, on multiple occasions and in furtherance of their scheme to defraud, and to obtain money by means of false and fraudulent pretenses, knowingly caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, including false and counterfeit pedigrees, in violation of the federal wire fraud statute, 18 U.S.C. § 1343. Each counterfeit pedigree transmitted by wire constituted a separate violation of 18 U.S.C. §

1343 and a separate act of racketeering. The RICO Defendants' use of interstate wire communications to continually upload, transmit, and receive data, information, and communications in furtherance of their unlawful activity, including text messages, mobile phone calls, and emails, was also integral to the scheme and the operation and maintenance of the enterprise.

243.    The RICO Defendants, on multiple occasions, and in furtherance of their scheme to defraud and to obtain money by means of false and fraudulent pretenses, knowingly caused to be sent and delivered the misappropriated funds to other RICO Defendants with the intent of concealing the nature, location, source, ownership, and control of the counterfeiting proceeds, in violation of the money laundering statute, 18 U.S.C. § 1956. Each transfer constituted a separate violation of 18 U.S.C. § 1956 and a separate act of racketeering.

244.    Each RICO Defendant committed and/or aided and abetted the commission of two or more of these racketeering acts in violation of 18 U.S.C. §§ 2, 1341, 1343, and/or 2320. The RICO Defendants' racketeering acts were multiple and repeated.

245.    These multiple racketeering acts were related and constituted a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5). The acts alleged were related to each other by virtue of common participants; common victims; a common method of commission; and the common purpose and common result of enriching the RICO Defendants while concealing their unlawful activities.

246.   CipherBlade PA was injured by the RICO Defendants' pattern of racketeering activity because Defendants have taken over business relationships, IT infrastructure, the CipherBlade PA website, and access to CipherBlade PA's accounts, as well as other assets and funds, through this unlawful scheme.

247.   As a result of their misconduct, the RICO Defendants are liable to CipherBlade PA for its injuries.

248.   The full scope of the RICO Defendants' fraudulent enterprise is not known, and the RICO Defendants' demonstrated pattern of deceptiveness indicates they may have perpetuated their scheme through unknown entities.

249.   Pursuant to 18 U.S.C. § 1964(c), CipherBlade PA is entitled to recover threefold its damages plus costs and attorneys' fees.

### Predicate Acts of Mail Fraud, Wire Fraud, and Money Laundering

250.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

251.   The claim for RICO is predicated on other acts. Here, Defendants racketeering activity relied on predicate acts of mail fraud, wire fraud, and money laundering under 18 USC § 1961.

252.   Each RICO Defendant engaged in a pattern of abuse that exceeded authorities granted with the intent to execute their scheme.

253. Defendants engaged in wire fraud when they created an email to impersonate Mr. Sanders and conduct official business on behalf of Plaintiff, in furtherance of their efforts to take control of CipherBlade PA. This email went so far as to include a photo of Mr. Sanders in the signature line, giving the impression that he sent the messages from this email address.

254. Defendants also used Mr. Sanders' email to contact customers and business contacts, knowingly using Mr. Sanders' name and photo to induce confusion and make deals to advance their scheme.

255. Defendants engaged in mail fraud when they sent a package from his home, fraudulently using his name, and personal credit card, to an address in Cyprus. This package, upon information and belief, includes relevant documents that belong to the Plaintiff, including the LLC and business filings. These items were mailed with the intention of furthering their scheme, as it included sensitive information about Mr. Sanders' business and was stolen from Mr. Sanders' home.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 35, Plaintiff demands trial by jury as to all issues that may be tried by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demand judgment against Defendants and each of them, jointly and severally, as follows:

1. Awarding Plaintiff an injunction against Defendants;

2. Awarding Plaintiff actual damages for past lost wages and benefits and future lost wages and benefits, in an amount to be determined at trial, but that would be in excess of $75,000;

3. Awarding Plaintiff increased, exemplary and/or treble damages for Defendants intentional tortious conduct;

4. Awarding Plaintiff attorneys' fees, costs and treble damages under 18 U.S.C. § 1964(c);

5. Awarding Plaintiff the costs of this action together with reasonable attorney's fees;

6. Awarding Plaintiff pre- and post-judgment interest in the statutory amount;

7. Return of domain cipherblade.com to CipherBlade PA;

8. Release and return of all IT infrastructure and operations platform (including, but not limited tom GSuite, Lawmatics, and Freshdesk) back to CipherBlade PA;

9. Cease onboarding and transferring clients to Defendants, including CipherBlade Alaska and Singapore;

10. Return of all clients, assets, trade secrets and other confidential information, corporate and business records and monies taken during the takeover of CipherBlade PA;

11. Such other and further relief as the Court deems equitable, just and proper.

Dated: October 18, 2023       HOLLAND & HART LLP

*/s/Michael C. Geraghty*

Michael C. Geraghty, ABA No. 7811097
William R. Crowther, ABA No. 2211097
420 L Street, Suite 550
Anchorage, Alaska 99501
Telephone: (907) 865-2600
mcgeraghty@hollandhart.com
wrcrowther@hollandhart.com